THOMAS PICKERING,

vs.

CHARLES H. B. DAY and WILLIAM WHITAKER, Sheriff. *

*Kent, September T.* 1866.

The consent by a Collector of Internal Revenue that a Deputy Collector should use in his private business public funds collected by him, such consent not being communicated and assented to by the sureties of the deputy in an official bond given to the collector, discharges the sureties.

Such consent not sufficiently proved in the particular case.

A denial by the answer, responsive to an allegation in the bill, must prevail, unless it is overcome by the testimony of two witnesses, or of one witness with sufficient corroborating circumstances.

---

* Another case, *Daniel McBride* vs. *the same defendants,* involving the same facts and principles, was heard together with the case here reported

Syllabus.

By Section 94 of the Act of Congress, entitled "An Act to provide Internal Revenue to support the Government, to pay interest on the public debts, and for other purposes," approved June 30th, 1864, an *ad valorem* duty of five per cent. was imposed upon "all manufactures of cotton, wool, silk, &c.," *or of other materials not in this act provided for*. *Held*, that molasses made from sorghum, not being otherwise provided for in the act, was subject to the *ad valorem* duty of five per cent.

The general rule of law as to the appropriation of credits is, that the debtor has the right, if he pleases, to make the appropriation. If he omits to do so, the creditor may make it. If both omit, the law will apply the payments according to its own notions of justice; and in cases of long and running accounts, where debts and credits are continuously occurring, and no balances are otherwise adjusted than for the mere purpose of making rests, payments ought to be applied to extinguish the debts according to the priority of time; so that the credits are to be deemed payments *pro tanto* of the debts antecedently due.

An exception to such general rule is the case of several official bonds executed by a collector or receiver of public revenue, at different times, with distinct sets of sureties. In such case, in the absence of any appropriation of payments made by the parties, money collected under a subsequent bond will not, before it is discharged, be applied in payment of a prior one; but a court of equity will so appropriate the payments as to give each bond credit for the money due and collected under it.

An apportionment of the amounts due on several successive official bonds, respectively indorsed on the bonds and signed by the sureties therein, is conclusive, in the absence of fraud or mistake.

Mistake, to avoid an agreement, must be a mistake, not of *law* but of *fact*; and it must be a plain mistake, clearly made out by satisfactory proof, not resting upon evidence loose, equivocal or contradictory.

The omission of a collector of public revenue to remove a deputy collector after knowledge of default by the latter, does not discharge the sureties of the deputy collector.

The provision of the act of Congress of June 30th, 1864, that a collector of Internal Revenue shall, before entering upon the duties of his office, execute an official bond, does not apply to collectors appointed under a prior act and who are continued in office under a saving clause in such prior act.

Provisions in statutes for the taking of official bonds are directory only, and not conditions precedent to the exercise of the office, unless expressed to be such.

BILL IN EQUITY FOR THE RELIEF OF SURETIES.—The bill filed in this cause set forth the following case:

The defendant, Charles H. B. Day, was the Collector of Internal Revenue for the Collection District of the State of Delaware, under the act of Congress entitled "An Act to provide Internal Revenue to support the Government and pay interest on the public debt," approved July 1st, 1862, having been appointed to said office by the President of the United States prior to October 3d, 1862. On the said 3d day of October he appointed John F. Clements Assistant Collector for Division No. 9, of said Collection District, the appointment being made by an instrument partly written and partly printed, under the hand of Day and his seal of office, the instrument being made part of the bill. Soon after his appointment Clements gave bond to Day, with surety, as Deputy Collector. At that time, as the bill alleged, Division No. 9 was limited to Murderkill Hundred, Kent County; and Clements had no authority, as Deputy Collector, outside of said Hundred, except by a verbal authority afterward given by Day to Clements, authorizing him to act as Deputy Collector for Mispillion and Milford Hundreds in said county. Pursuant to this last appointment Clements gave Day another bond, dated June 13th, 1863, with Joshua R. Clements, William Smith, James Green and the complainant as his sureties. This bond was in the penal sum of $10,000, with a condition as follows: "The condition of this obligation is such, that if the said John F. Clements, being Deputy Collector of Internal Revenue for Division No. 4, of the Collection District of the State of Delaware, shall faithfully and diligently collect all the rates and taxes which he shall, according to the duplicate to be issued to him as Deputy Collector of Internal Revenue, be required to collect, and all taxes whatever which shall be committed to him for collection, and shall pay over the amount of all such rates and taxes at such time or times and in such manner and form as shall

be prescribed and directed by the said Charles H. B. Day, Collector of Internal Revenue for the District of the State of Delaware; and further, if the said John F. Clements shall perform the duties of his office, as Deputy Collector of Internal Revenue as aforesaid, in all things with fidelity, then the above obligation shall be void, otherwise to be and remain in full force and virtue." There was also annexed to the bond a joint and several warrant of attorney for the confession of judgment.

The bill further alleged that after the execution of said bond Clements entered upon the discharge of the duties of his appointment, and continued to act therein until on or about the 9th day of August, 1865, when the complainant and his co-sureties were informed by Day that Clements had failed to pay over the moneys collected by him under his appointment, and was a defaulter to a very large amount, viz.: between $10,000 and $12,000. Soon after the complainant and his co-sureties knew of the defalcation of Clements, they, together with Clements, met Day at his Collector's office at Dover. There were present also on that occasion, Nathaniel B. Smithers and Eli Saulsbury, Esquires, the former being the counsel of Day, and the latter the counsel on that occasion of the complainant and his co-sureties, the said counsel being present for the purpose of giving a legal opinion whether the last mentioned bond was not superseded and rendered unavailing by another bond which, after the giving of the said last mentioned bond, had been taken by Day from Clements, with Joshua R. Clements and Daniel L. McBride as sureties, in the sum of $5,000, with like condition as is heretofore set forth. At said meeting Day proposed to enter judgment on the two last mentioned bonds and issue execution against John F. Clements, but, as a preliminary step thereto, he required that an entry should be made and signed on said bonds, stating what amount was due on each of them, and this he said was essential to the issuing of the proposed

execution. The bill alleged that under such impression Clements, with the complainant and his co-sureties, signed a writing on the bond, in which they were sureties,acknowledging that there was at that time due upon the same the sum of $7,680.38.

On the 10th day of August, 1865, Day caused judgment to be entered on the last-mentioned bond against Clements, severally, and caused execution to be issued thereon. The bill alleged that after the entry of said judgment and the issuing of the execution thereon the complainant and his co-sureties were informed by Clements, and so believe, that soon after his appointment Clements, finding the emoluments of his office would not justify him in discharging the duties thereof, and he then being engaged in the mercantile business with one William S. Prouse as his partner, he, the said Clements, called upon Day and informed him that he was unwilling to retain the office and discharge the duties thereof unless he, Day, would permit Clements to use the money to be collected by him, in his business as grain buyer and speculator; to which use said Day assented; that in consequence of such assent Clements and his partner, Prouse, under the firm name of John F. Clements & Co., did use the said money, as the same was collected by Clements, in their grain business; that by reason thereof, the grain business having proved disastrous, the defalcation occurred; that before said assent no defalcation had occurred; that the complainant and his co-sureties had no knowledge of the arrangement between Clements and Day for the use of the public money in said grain business until some time after their signing of the indorsement on the official bond of Clements. The bill alleged as corroborative of the fact that Day assented to the such use of money by John F. Clements & Co., in their business, that many of the payments made by Clements to Day were made by drafts of John F. Clements & Co., on their factors in New York and Philadelphia, to whom they

43

consigned grain in their business; and the bill referred particularly to nine of such drafts set forth at large in it.

The bill further alleged that in the month of July, 1865, the complainant called upon Day and asked him whether Clements was prompt in paying over to Day the money collected by him under his said appointment, and whether he was not at that time behind in his payments; that Day replied he was only a little behind—only a few hundred dollars; that such information had the effect to lull the complainant into security and make him believe there was no danger of loss.

The bill further alleged that after the complainant and his co-sureties had been informed of the use of the public money by John F. Clements & Co., they determined to resist the payment of any money on the said official bond, and as sureties so informed Day, who thereupon caused judgments to be severally entered against the complainant and his co-sureties, and also caused a *fieri facias* thereon to be issued against the complainant.

The bill relied upon several grounds of equitable relief, viz:

1. That the consent of Day, (without communicating such consent to the sureties,) that Clements might use the money collected under his appointment in the business of the firm of John F. Clements & Co., ought, in a court of equity, to relieve the sureties from all liability from the time such arrangement was made; and that all the money due from Clements to Day, under the bond on which the sureties were held, was collected by Clements after such assent was given, and was with such assent used by him in the business of grain buying by himself and his partner.

2. That the erroneous statement made by Day to the complainant had the effect of creating a false security as to the liability of Clements, and prevented the sureties from taking steps to secure themselves against the then existing defalcation of Clements.

3. That the account of Day against Clements, as shown by Day at the time of the indorsements made on the bonds as before mentioned, was erroneous, because he had neglected to credit the said account with two checks given to Day by John F. Clements & Co. in part payment of the then existing indebtedness of Clements as Deputy Collector; both said checks being drawn on the Farmers' Bank at Dover, to the order of Day, one dated April 29th, 1864, for $225.62; the other dated February 7th, 1865, for $2,000; which said checks ought to have been credited by Day in the before mentioned ascertainment of the balance due on said bond.

4. That a part of the indebtedness of Clements, which is sought to be recovered from the complainant, is on account of rates, duties or taxes paid by the manufacturers of sorghum molasses to Clements; which, as the bill charged, was collected without any authority of law; and, therefore, the complainant could not be held liable for the money so collected. The bill prayed a discovery by Day of the sums collected on account of sorghum molasses.

5. That after the date of the bond to which the complainant and his co-sureties were parties other acts of Congress were passed, imposing duties and taxes not provided for by any law existing at the date of said bond; the collection and payment of which additional taxes were not in the contemplation of complainant and his co-sureties in said bond, and formed no part of the contract with Day; and for any defalcation by Clements in relation to any of the additional taxes imposed after the date of said bond the complainant and his co-sureties were not liable, either at law or in equity. And the bill particularly referred to an act of Congress entitled "An Act to increase the Internal Revenue and for other purposes," approved March 7th, 1864; also to an act entitled "An Act to provide Internal Revenue to support the Government, to pay interest on the public debt and for other purposes," approved June 30th,

1864. The bill further insisted that as the act last referred to repealed the act of July 1st, 1862, except as to certain savings mentioned in said repealing act, Day had no authority to collect any taxes or assessments imposed by said. repealing act, without a re-appointment and the giving of a new bond, as required by said act; and consequently he neither had nor could give to Clements authority to collect any taxes imposed by the act of June 30th, 1864. The bill alleged that Day had never been re-appointed, nor had ever given a new bond since the approval of the act of June 30th, 1864; nor had he since the approval of said act appointed Clements Deputy Collector; and the bill alleged that most of the money due from Clements, was for taxes and duties imposed by the act of June 30th, 1864. It also alleged that at the time of the signing of the indorsement on the back of the bond to which these sureties were parties, ascertaining the amount due thereon, the complainant and his co-sureties were ignorant of the fact that most of the money then due from Clements was for taxes imposed under the law of June 30th, 1864; and they did not then know that Day had not been re-appointed, and that he had not given a new bond, as required by said act; nor did they know that Clements was acting as Collector of taxes without proper authority of law; but that said Day at the time of the signing of said indorsement well knew all the facts aforesaid.

The bill prayed a perpetual injunction against the collection of the bond and for general relief.

The answer of the defendant, Day, admitted his appointment as Collector of Internal Revenue; that he was commissioned by the President, August 11th, 1862, and confirmed by the Senate; that afterward, on March 4th, 1863, he was again commissioned as Collector of Internal Revenue for the District of Delaware, to hold during the pleasure of the President; that under the authority of his office

he divided the State of Delaware into twelve sub-districts or divisions, for each of which he appointed a deputy collector; and that he appointed John F. Clements Assistant Collector of Division No. 9, which was composed of Murderkill Hundred; that Clements, upon such appointment, gave bond in the penal sum of $15,000, with Thomas Pickering, James Green, Joshua R. Clements, William Smith, and Daniel L. McBride, as his sureties therein; said bond bearing date October 1st, 1862, and subject to the condition fully set forth in the answer. The answer admitted that Clements, as Assistant Collector of Division No. 9, had no authority to collect taxes from persons resident out of the limits of Murderkill Hundred; that he was verbally authorized by the defendant temporarily to collect taxes from persons resident in Milford and Mispillion Hundreds; that such verbal appointment was made because Peter L. Lofland, who had been appointed Assistant Collector for Milford and Mispillion Hundreds, had resigned, and there was no one to collect the taxes in those Hundreds; that no bond was required of Clements upon his verbal appointment to collect the taxes in Milford and Mispillion Hundreds.

The answer set forth a statement of the amount of all the lists of taxes which were delivered to Clements for collection prior to the first day of October, 1863, and the amounts paid by him prior to said date, and showing the balance existing against him at that time; and it averred the subsequent payment thereof out of the money returned as collected on said lists, and that the complainant and his co-sureties in the bond to restrain the collection of which the injunction was prayed for by the bill, were in no manner held liable or accountable for said sum or any part thereof, but that the same was paid by Clements by the application of sufficient funds derived as before stated in said amswer.

The answer further averred that on the 1st day of Octo-

ber, 1863, the defendant, under the authority of his office, districted the State of Delaware into six parts; that each county embraced two parts, and that the hundreds of Murderkill, Milford and Mispillion, which had before constituted two parts, numbered 9 and 10, were then consolidated into one district or division, and called No. 4; that upon such new districting, on the 1st of October, 1863, John F. Clements was appointed Deputy Collector of Internal Revenue for District No. 4, comprising Murderkill, Milford and Mispillion Hundreds aforesaid, and a new deputation or letter of appointment was issued to him, of the same tenor as the one theretofore issued to him, except as to date, the district for which the appointment was made, and the substitution of the title Deputy Collector in the latter for Assistant Collector in the former; that upon such new appointment of Clements, the defendant required of him that he should execute a new bond, with surety for the faithful execution of his said office; and thereupon the said Clements, with Joshua R. Clements, William Smith, James Green, and Thomas Pickering, as his sureties, duly executed and delivered their joint and several bond in the penal sum of $10,000, with a condition thereunder written, which is fully set forth in the answer, and is the same as is stated in the bill of complaint, and to which was annexed a joint and several warrant of attorney for the confession of judgment for said penalty.

The answer further stated that the day and month of the execution was left blank in said bond at the time it was delivered to him, and continued blank until they were improperly filled by George M. Manlove, who was acting for the Prothonotary, at the time it was left in the Prothonotary's office, for judgment to be entered thereon against the said John F. Clements, but that said bond had been executed by the obligors therein and delivered to him prior to October 20th, 1863, and before any lists were issued to or taxes collected by said Clements, as Deputy

Collector of District No. 4. The defendant averred that said bond was not executed on the 30th of June, as stated in the copy of the same, set forth in the bill, nor until after the 1st day of October, 1863, when the State was re-districted, but the same was executed upon the appointment of Clements as Deputy Collector of District No. 4.

The answer admitted that the bond set forth in said bill is, except the date thereof, of the same tenor and effect as the bond upon which judgment was entered, to restrain the collection of which the said bill of complaint was filed.

The answer further stated that after the said Clements was appointed Deputy Collector of District No. 4, he entered upon the duties of his office, and continued until July 15th, 1865, when he was removed by the defendant, but that no lists had been sent to him for collection after June 30th, 1865, and no collection had been made by him after July 15th, 1865.

The answer then set forth in detail the facts leading to and attending the meeting, in the bill referred to, between this defendant, together with said Clements and the sureties in the several bonds; which facts were averred to be as follows:

On the 9th day of August, 1865, Daniel L. McBride, who was one of the sureties in another bond subsequently given, called upon the defendant to know if Clements was not very much behind in his payments, to which the defendant replied he was; and said McBride went with him to his office, where the defendant showed him his books, balanced as of June 30th, 1865, and showing a balance against Clements of $11,520.57. Upon inquiry by McBride what should be done, the defendant suggested that Clements and all his sureties should meet at the office of the defendant next day, at 1 o'clock P. M., to which McBride assented. On the 10th day of August, 1865, Clements and all his sureties met in the office of the defendant, in Dover, where the accounts of Clements were shown

to him and assented to as correct. Offers were then made by Clements to assign the partnership property of John F. Clements & Co., or portions of it, which offers were not accepted, as they might conflict with the claims of the creditors of the firm. N. B. Smithers, Esq., was sent for to advise in relation to such transfer, and he expressed doubts as to the validity of such transfer as against the creditors of the said firm. It was then suggested by the complainant or James Green, another of the sureties, that judgment should be entered against John F. Clements, and an execution issued thereon to secure what property could be reached. Thereupon, a controversy arose between the sureties as to their respective liabilities; James Green, one of the sureties, suggesting the inquiry whether the bond in which he was a surety was not superseded by another bond subsequently given by Clements, in which Daniel L. McBride was a surety; which latter bond was for the penal sum of $5,000, and with a condition similar to the other; while the said McBride contended that his bond was merely additional, and that before proceedings could be had thereon the other bond must first be exhausted. Mr. Smithers declined to give an opinion on these questions, and, as he was counsel for the defendant, suggested to them to procure other counsel; and accordingly Eli Saulsbury, Esq., was sent for, and expressed the opinion that the taking of the latter bond did not supersede the former bond of $10,000; whereupon the sureties again requested the defendant to enter the bonds respectively against the said John F. Clements and issue execution thereon. The defendant, being willing to relieve the sureties as far as he could out of the effects of Clements, assented to the entry of judgment and the issuing of execution against Clements, but stated that, as the defalcation was larger in amount than the penalty of either of the said bonds, it would be proper for the sureties to agree among themselves as to the amount which should be

collected on each bond, to which proposition no objection was made by the sureties themselves or by their counsel; and it was agreed by them that the amount to be collected on each bond should be in proportion to the penalty of their respective bonds, with the further understanding between themselves that the question as to the amount they should contribute among themselves should be left to arbitration, and that of the questions which might arise in considering this matter the two questions as to whether the sureties in the bond in the penal sum of $10,000 were liable for any taxes other than those assessed at the rate prescribed by law at the time said bond was executed; and whether the sureties in the bond in the penal sum of $5,000 were liable in a *pro rata* amount with the sureties in the other bonds, or whether the said bond was not taken as additional security merely, and the sureties therein only liable for the amount which remained unpaid after applying the penalty of the first bond, should be specially referred to arbitration. The answer averred that the complainant and his co-sureties were not ignorant of the fact that a large portion of the defalcation of Clements was for taxes and duties other than those assessed at the rates prescribed by law at the time said bond in which complainant was surety was executed, but that the whole matter was discussed at the said conference by the sureties, and the proposition of their exemption from liability on that ground was clearly stated and considered by them and the reference of that matter specially agreed to by them, as between themselves; and the conclusion was definitely arrived at by them that they would agree to the amounts which should be collected by the defendant on the said bonds respectively absolutely, but that as among themselves the matter of contribution and ultimate liability as to one another should be referred. The answer further stated that upon such conclusion being arrived at by the sureties, Mr. N. B. Smithers, at their request, ascertained

the amount on the bond in the penal sum of $10,000 to be the sum of $7,680.38, and on the bond in the penal sum of $5,000 the amount to be $3,840.19, which amounts the defendant was proceeding to enter on the back of the bonds, when one of the sureties in the $10,000 bond, and, as the defendant believes, Thomas Pickering, declared his intention not to sign the agreement to refer to arbitration; whereupon Daniel L. McBride declared that he would not sign the indorsement on the bond. After Pickering, Green and Smith had returned from an interview between themselves in another room Pickering expressed his willingness to sign the agreement to refer to arbitration, whereupon the defendant, at the request of Pickering, wrote on the bond for $5,000 the following :

"Aug. 10, 1865. We agree that the true amount due "upon this bond is the sum of three thousand eight hun-"dred and forty dollars and nineteen cents, with in-"terest from June 30th, 1865. Witness our hands and "seals.

| "Witness: | "JOHN F. CLEMENTS, | [L. S.] |
| "N. B. SMITHERS. | "DANIEL L. McBRIDE, | [L. S.] |
| | "JOSHUA R. CLEMENTS;" | [L. S.] |

and on the bond in the sum of $10,000 the following :

"Aug. 10, 1865. We agree that the true amount due "on this bond is the sum of seven thousand six hun-"dred and eighty dollars and thirty-eight cents, with in-"terest from June 30th, 1865. Witness our hands and "seals.

| "Witness: | "JOHN F. CLEMENTS, | [L. S.] |
| "N. B. SMITHERS, | "JOSHUA R. CLEMENTS, | [L. S.] |
| "ELI SAULSBURY. | "WILLIAM SMITH, | [L. S.] |
| | "JAMES GREEN, | [L. S.] |
| | "THOMAS PICKERING;" | [L. S.] |

which agreements were duly stamped, and signed and sealed by the obligors in the respective bonds. When the agreement had been signed and sealed on the back of

the bonds as aforesaid Mr. Smithers, with the consent of all the sureties, and, as the defendant believes, at the express request of Thomas Pickering, wrote for the sureties an agreement to refer to arbitration, which is fully set forth in the answer, and, which agreement, after reciting the execution of the bonds aforesaid, the purposes for which they had been given, the default of Clements, the indorsements on the bonds, the purpose thereof, and the different questions which had arisen between the sureties themselves, whether the bond in $10,000 was only liable for the collection and payment of taxes at the rate prescribed by law at the time said bond was executed, and whether the bond in $5,000 was not additional merely, and not liable until the whole amount of the first bond was exhausted, referred these and all other questions arising between themselves to Messrs. Smithers and Saulsbury, with power in them, in case of disagreement, to call in a third person—which agreement was duly stamped, signed and sealed by all the sureties in both bonds.

The answer denied that there was any concealment, fraud or pretense on the part of defendant to induce said sureties, or any of them, to agree to or sign the said agreement indorsed on the bonds, but the same was their own understanding and voluntary action, the defendant all the time expressing himself perfectly satisfied with his position, and only acting according to the wishes of the said sureties, but stating that unless they did sign said indorsements he should enter the bonds against the sureties and then rest—to which course they objected.

The answer admitted the entry of judgment and the issuing of execution against John F. Clements, but averred that the same was done at the express desire and earnest solicitation of the said sureties, and with the approbation of Clements.

The answer denied that Clements ever informed the defendant that he was unwilling to retain the office of Deputy

Collector; and further particularly denied that the defend-
dant ever, directly or indirectly, consented, assented or
agreed to the use of the money collected by said Clements,
by him or the firm of John F. Clements & Co., or by any
other person, for any purpose whatsoever, but averred that
the defendant was persistent in his efforts to procure from
Clements the payment of the taxes committed to him
for collection; and further averred that whenever Cle-
ments spoke to the defendant about the small profits of
his office the defendant expressed his willingness to ac-
cept his resignation, and on one occasion sent his brother
to see Clements and endeavor to procure his voluntary
resignation.

The answer further stated that the defendant made no
communication to the sureties of any arrangement for
the use of the money, because no such arrangement was
ever made; but, on the contrary, that every charge, mat-
ter and information by which the existence of any such
arrangement or understanding is asserted or alleged in
the bill of complaint is utterly untrue.

The answer averred that the defendant had no knowl-
edge or suspicion that the money was so used until about
February 1st, 1865, when the books having been bal-
anced, as of January 1st, 1865, the defendant found Clem-
ents in arrear to a large amount, mentioned in the answer,
and thereupon the defendant sent a statement of the ac-
count to Clements, with a peremptory letter for pay-
ment; that after a few days, and about February 1st, 1865,
Clements called upon the defendant and told him that he
could not pay, that his funds were locked up in grain, and
that navigation had closed, but that as soon as navigation
opened and he could get his vessel to New York he would
pay. The defendant then reproved Clements for the use of
the money, and Clements admitted that he ought not to have
so used the money. In a subsequent conversation, while the
defendant was animadverting upon the use of the money in

the presence of John H. Bateman, Clements admitted that he ought not to have used it, and said that if he ever got out of this scrape he would never be caught in another.

The answer, after making some other statements not necessary to be here mentioned, denied that the defendant ever had any such conversation with the complainant as stated in the bill; averred that the only conversation he had with the complainant prior to the conference on the 10th of August, 1865, relative to Clements, was before the 7th day of June, 1865, when the complainant met the defendant on the street in Dover, about the 1st and before the 7th day of June, 1865, and asked him if Clements was up with his payments, to which the defendant replied, he was not, but he had promised to return his lists and make his accounts good by the 15th day of June. The answer further averred that none of the sureties asked the defendant or his clerk relative to the state of accounts of said Clements prior to August 10th, 1865, or had any conversation in reference thereto with the defendant, except the one above mentioned of the complainant, and the one above stated with McBride. The answer then set forth a statement of the indebtedness of Clements on March 31st, 1865, which was stated to be $18,044,46.

The answer, after some further averments, stated that the defendant refrained from entering the bonds against the sureties until he was informed by J. P. Comegys, Esq., their counsel, that they intended to resist the payment thereof; whereupon, the defendant caused judgment to be entered severally against the the sureties, and caused execution to be issued against the complainant and against Daniel L. McBride, and was proceeding to collect the same when he was stayed by the injunction of this Court.

The answer denied that any of the monies collected on lists which were issued to Clements subsequent to the execution of the bond in the sum of $10,000 was taken or applied to any indebtedness of Clements which was in-

curred prior to the making of said bond, and set forth a statement of the manner in which the payments were made.

It also denied that the account of Clements was entitled to any credits other than those which were given at the time of the ascertainment of the balance aforesaid of $11,520.57; and it specially denied that the two checks mentioned in said bill were applicable to the accounts of said Clements as Deputy Collector. The answer stated the circumstances under which said checks were given, one to pay a note in favor of William L. Hansell & Co., of Philadelphia, which had been sent to N. B. Smithers, Esq., for collection; the other to pay money which had been borrowed by Clements of the defendant.

The answer averred that the aforesaid balance, instead of being diminished, ought to be increased by the sum of $790, less $277.82, commissions, which sum had actually been received by Clements but had never been returned by him, and which amount was discovered by the defendant after the ascertainment of the aforesaid balance.

The answer admitted that the several drafts mentioned in the bill were drawn as therein stated, and that the defendant received the amount thereof and credited the same to the account of said Clements; and further stated that such drafts were an accommodation to the defendant in his business, and set forth an account of his mode of business: that said Clements, when about to make any payments to the defendant, would usually ask him whether he preferred the money or a draft, and that the defendant would reply to him that he preferred a draft.

The answer further stated that of the lists delivered to Clements for collection, the sum of $2,010.60 was assessed on the manufacturers of sorghum molasses, of which $258.41 was assessed prior to June 30th, 1864, and the residue of $1,752.20 was assessed subsequently; of which latter amount the sum of $21.42 was abated to the manu-

facturer, and the whole of said sum of $2,010.60, except the amount abated to the manufacturer, was received by Clements; and that no tax on sorghum, manufactured after March 3d, 1865, was placed in his hands. The answer insisted that the defendant had authority by law to collect the tax on sorghum, and that he was directed to collect the same by a letter of instruction from the Commissioner of Internal Revenue, which letter was made part of the answer.

The answer admitted the passage of certain acts of Congress in the bill mentioned, making changes and alterations in the rates of taxes after the execution of the bond in $10,000; but it insisted that the sureties in the bond were not thereby released. It also admitted that the defendant had not, since the passage of the act of Congress, approved June 30th, 1864, been re-appointed by the President; nor had, since the passage of said act, given a new bond; but it insisted that neither such re-appointment nor the giving of a new bond was necessary.

The answer set forth a statement of the lists of taxes delivered to Clements for collection, and a statement of the duplicate returns which had been returned by him during his entire term of office as Deputy Collector. It also set forth some specific sums of money which Clements had received, but of which the defendant was ignorant at the time of the ascertainment of the balances indorsed upon the bonds.

There were annexed to the answer, and made a part of the same, sworn copies of the accounts of the defendant. It was agreed between the solicitors of the respective parties, among other things, that the agreement of the sureties to refer to arbitration was correctly set forth in the answer, and that the bonds and the indorsements thereon were also correctly set forth.

The cause came before Edward Ridgely, Esq., Chancellor *ad litem*, (the Chancellor having been of counsel for the de-

fendant before his appointment to office) and was argued at great length on the 6th, 7th, 8th, 9th, 12th, and 13th days of February, 1867.

*J. P. Comegys* and *E. Saulsbury*, for the complainant.

*N. B. Smithers*, for the defendant.

RIDGELY, CHANCELLOR, *ad litem.*—The first question presented to the Court for its decision in this case is, whether Charles H. B. Day, the defendant, consented to the use of the money collected by Clements as Deputy Collector, by the said Clements, or the firm of John F. Clements & Co., in their business of grain buying and speculating, as charged in the bill of complaint.   For if such was the fact, it was a wrongful act of the defendant not communicated to, or assented to, by the sureties of Clements, and the consequences of such wrongful act of the defendant must and ought to fall upon the party committing it.   Is such consent of the defendant to the use of the public money proved in this case ?   The allegations in the bill on this point are founded solely on information communicated to the complainant and his co-sureties by J. F. Clements after the 10th day of August, 1865, the day of the conference at Day's office, in Dover, if we except the fact that many of Clement's payments to the defendant were made by drafts, drawn by J. F. Clements &·Co., on their factors in New York and Philadelphia, to whom they had consigned grain, which is alleged in the bill to be corroborative evidence of the truth of the information furnished by Clements.   The answer persistently and unequivocally denies any such consent by the defendant.   The answer is clearly responsive as to this point, and, to quote from an authority cited by one of the solicitors for the complainant while discussing the question now under consid-

eration, 3d *Greenleaf on Evidence, Sec.* 289, " An answer " which is responsive to the allegations, and charges made " in the bill, and contains clear and positive denials thereof, " must prevail unless it is overcome by the testimony of " two witnesses to the substantial fact, or at least by one " witness and other attendant circumstances, which sup- " ply the want of another witness, and thus destroy the " statements of the answer, or demonstrate its incredibil- " ity or insufficiency as evidence." This being the rule laid down by approved writers on the subject, it becomes essential to consider whether there is any evidence in this case to overcome the answer on this point. The only witness adduced by the complainant to sustain the allega- tion in the bill, as to the consent of the defendant to the use of the public money is John F. Clements himself. His language on this point is as follows : " I do not recol- " lect what reply Mr. Day made, but I know that he didn't " object; my impression is that he gave his consent; I " feel very sure Mr. Day did give his consent that I should " use the public money in my business, as I do not know " Mr. Prouse's name was mentioned, but Mr. Day knew " we were in business together. He did give his consent " on the occasion of Mrs. Wilson's funeral." It is not necessary here to comment on the vagueness of the testi- mony of Clements in this particular, nor on the hesitancy with which he speaks of the consent of the defendant to the use of the public money.

For the sake of the argument, let it be admitted that the testimony of Clements is positive and direct as to the consent of the defendant. How is his testimony on this point to be reconciled with the testimony of John H. Bate- man, a witness for the defendant, in which Mr. Bateman testifies that he was present at a conversation between the defendant and Clements, in which Clements, among other things, told Day that " if navigation had not closed he

45

" would have had funds sufficient to pay all his dues as " Deputy Collector, and that he (Day) would not have " known anything about it,"—referring to the use of the money ? This conversation, says Mr. Bateman, occurred at Day's office, in Dover, about the latter part of January or the first part of February, 1865, which is long after the time when Clements says Day consented to the use of the public money. If Clements' testimony is to be credited, how is it that Day would not have known of the use of the money when he had long before given his consent thereto ? But let us go still farther and admit, for the sake of the argument, that Bateman is mistaken and ought not to be credited, and that the testimony of Clements stands in no wise discredited, weakened or impaired. Is the fact that many of the payments made by Clements to Day were by drafts of John F. Clements & Co., drawn on their consignees in Philadelphia and New York, such an attendant or corroborating circumstance as, connected with the testimony of Clements, should overcome the positive and direct denial of the defendant in his answer ? I think not. The defendant, in his answer, states that his usual mode of doing business was, that he would go to the Farmers Bank and request of them a check on the Philadelphia Bank; and when he arrived in the city he would draw the money on this check from the Philadelphia Bank and pay the same over to the proper government officer; and J. P. Wild, the Cashier of the Farmers Bank at Dover, in his deposition in this case taken on the part of the defendant, corroborates the answer in this particular.

A draft on a Philadelphia or New York commission merchant, in good standing, answered the purposes of the defendant as well as a check on a Philadelphia bank. Mr. Clements was in the grain business before and at the time of his appointment as Deputy Collector, and this was

known to the defendant; and, being in the business of buy-ing and speculating in grain, it is natural that he or the firm should have, from time to time, funds in the hands of their consignees, realized from the sale of the grain consigned to them; and as the drafts were more convenient to the defendant than the money, and therefore preferred by him, while, at the same time, the taking of them by the defendant as cash enabled the firm of John F. Clem-ents & Co. to draw from their consignees the proceeds of their grain, and thus have the funds in their own hands for use, it was not at all strange that many of the pay-ments were by drafts. In fact, it was a mutual accommo-dation to both parties, and from it no thought, or even suspicion, would necessarily or probably have arisen in the mind of the defendant that the public money was being used by Clements, or the firm of John F. Clements & Co., in their business. Upon the whole, therefore, ap-plying the rule above quoted, taking into consideration the testimony of Clements on this point, vague and loose as it is, and, to say the least, weakened by the testimony of Bateman, and unsupported by any attendant circum-stances that would have naturally created in the mind of the defendant a suspicion of the use of the public money, I am of the opinion that it has not been proved in this case that the defendant consented to the use of the public money by J. F. Clements or John F. Clements & Co., or that he knew of such use until about the first part of Feb-ruary or the latter part of January, A. D. 1865.

Having disposed of that question, we will now consider whether the amount, as shown by the books of the defend-ant to be due from Clements to the defendant on the 10th day of August, A. D. 1865, was entitled to any credits for payments which had been made by Clements to the defendant, and which were not, but ought to have been credited. It is alleged and charged in the bill that two

checks on the Farmers Bank, at Dover, one dated April 29th, 1864, for $225.62, the other dated February 7th, 1865, for $2,000, drawn by John F. Clements & Co., in favor of defendant, were payments made by Clements as Deputy Collector, and ought to have been credited to his account as such Deputy Collector. The answer denies that either of these checks was given in payment of any dues from Clements as Deputy Collector ; or that his account as Deputy Collector ought to be credited with the amount of said checks, or either of them.

The answer then states the circumstances and purposes for which the checks were given to the defendant; the check of $225.62 being given in payment of a note of William L. Hansel & Co., of Philadelphia, against John F. Clements, which note had been sent to N. B. Smithers, Esq., for collection, but which he, on his departure from Dover, to take his seat as a member of Congress, had left with the defendant to be collected from John F. Clements ; and that the check for $2,000 was given to the defendant in payment of money loaned by the defendant to Clements.

It is admitted in the written agreement of the solicitors for both parties, that the check for $225.62 was given to the defendant for the purpose stated in the answer, and no deduction from the amount shown due from Clements, as Deputy Collector, on the 10th day of August, 1865, is now claimed on account of said check. Nothing is admitted by the solicitors in relation to the check for $2,000 above mentioned, and it is for the Court to decide upon the evidence in this cause whether the check for $2,000, dated April 7th, 1865, was a payment made to the defendant by Clements in the course of his business as Deputy Collector, or whether it was a payment made to Day for money by him loaned to John F. Clements. On this point there is but little room to doubt, and nothing is left for conjecture. The answer of the defendant in relation to this matter, is direct and positive, and is corroborated

in this particular by the testimony of Matthias Day, of John H. Bateman and William S. Prouse, witnesses in this cause for the defendant. Against them we have the weak belief of John F. Clements that the amount of said check ought to have been credited to his account as Deputy Collector. It is, I think, clearly proved that the check for $2,000 was given to Day in payment of money borrowed of him by Clements, and had no relation to or connection with the business of Clements as Deputy Collector.

I am, therefore, of opinion that the checks referred to ought not to be credited on the account of the defendant against Clements as Deputy Collector, and that no deduction from the amount shown due from Clements as Deputy Collector by the books of the defendant on the 10th day of August, 1865, ought to be made for or on account of the money received by the defendant on the said two checks, or either of them.

We are next brought to consider whether the complainant and his co-sureties are properly chargeable for any moneys collected by said Clements, as Deputy Collector, on taxes against the manufacturers of molasses from sorghum, and whether the amount shown due from Clements, as Deputy Collector, on the 10th day of August, 1865, ought to be abated or diminished by the amount admitted by the defendant in his answer to have been collected by Clements on taxes against the manufacturers of molasses from sorghum. This raises the question whether the defendant, as the Collector of Internal Revenue for the District of Delaware or John F. Clements, as his Deputy Collector, had any authority by law to collect any tax assessed on the manufacture of molasses from sorghum ? The bill alleges that neither the defendant nor his Deputy Collector had any lawful authority to collect such tax, while the answer avers that the defendant and his Deputy Collector had such lawful authority.

In the discussion of this question at the bar the arguments of the solicitors for the complainant were confined to the construction of the act of Congress entitled, "An Act to provide internal revenue to support the Government, to pay interest on the public debt, and for other purposes," approved June 30th, 1864; and we will now examine said act to ascertain whether, under the provisions therein contained, any tax is imposed on the manufacturers of molasses from sorghum.

By Section 94 of the act aforesaid it is provided : " That " upon the articles, goods, wares, and merchandise here- " inafter mentioned, except where otherwise provided, " which shall be produced and sold, or be manufactured " and sold, or be consumed or used by the manufacturer " or producer thereof, or removed for consumption or " for delivery to others than agents of the manufacturer " or producer within the United States or Territories the " of, there shall be levied, collected and paid the following " duties, to be paid by the producer or manufacturer there- " of, that is to say,"—then follows the enumeration of certain articles, goods, wares and merchandise, and among others is, " molasses, produced from the sugar cane," and not from sorghum or imphee, " a duty of five cents per gallon."

It is evident from the language here used that molasses made from sorghum or imphee is not subject to the specific duty of five cents per gallon; for it is, by positive words, expressly excepted from the duty of five cents per gallon ; nor is molasses made from sorghum or imphee expressly, by words, taxed in the act.   In a subsequent part of the same section occur these words : " On all manufac- " tures of cotton, wool, silk, worsted, flax, hemp, jute, in- " dia rubber, gutta-percha, wood, willow, glass, pottery- " ware, leather, paper, iron, steel, lead, tin, copper, zinc, " brass, gold, silver, horn, ivory, bone, bristles, wholly or " in part, or of other *materials*, not in this act otherwise

" provided for, a duty of five per centum *ad valorem*."
Section 96 of the same act specifies and enumerates articles which are exempted from tax; and in this section, molasses made from sorghum or imphee, is not mentioned; and it is, I think, clear that by this section such molasses is not exempted from duty. It is now for us to ascertain whether, from a fair construction and interpretation of the words last above quoted from Section 94, a duty of five per centum *ad valorem* is thereby imposed on molasses made from sorghum or imphee.   Is sorghum a " material" ? and is molasses made from sorghum a manufacture thereof?   That these questions can admit of no other but an affirmative answer is, I think, beyond all doubt.   Then is such molasses otherwise provided for in said act ?—for if it is, it is not subject to the *ad valorem* tax of five per centum.   From a careful examination of the provisions of the act relative to the matter now before us, I am forced to the conclusion that such molasses is not otherwise provided for in said act.   It would be strange and unnatural to say that the clause imposing a tax of five cents on the gallon on molasses not manufactured from sorghum or imphee was a provision for molasses manufactured from sorghum; yet to such a point we are necessarily brought if we say that molasses manufactured from sorghum is not included in the words last above quoted from Section 94, and is not subject to the *ad valorem* duty of five per centum.

To this I cannot assent; and as molasses made from sorghum is not exempted from tax by Section 96, or any other section of said act, I am of opinion that under the provisions of the act of Congress aforesaid, approved June 30th, 1864, molasses manufactured from sorghum or imphee is subject to a tax of five per centum *ad valorem*.

In this opinion I am strengthened by acts of Congress passed since June 30th, 1864; one approved March 3d, 1865, in which, by the first section thereof, Section 96 of

the act of June 30th, 1864, is amended by inserting after the words, "concentrated milk," the words, "cider, and "cider-vinegar, and sugar, or molasses made from other "articles than the sugar cane," thereby exempting molasses made from sorghum or imphee; and the other, approved July 13th, 1866, in which, by Section 91 of said last mentioned act, sugar, molasses, or syrup, made from beets, corn, sugar-maple, or from sorghum or imphee, are exempted from all tax. If the Congress of the United States had, at the time of the passage of the act of June 30th, 1864, intended to exempt molasses made from sorghum from any tax or duty, is it not reasonable to presume that they would have done so by the same expression, or expressions of a similar import as those employed for that purpose in the acts of Congress last above referred to? It will not do to say that the subject was not in the contemplation of Congress at the time of the passage of the act of June 30th, 1864; for, in said act molasses made from sorghum or imphee is expressly excepted from the specific duty of five cents on the gallon by said act imposed on other molasses, thus conclusively showing that the matter of molasses produced from sorghum or imphee was expressly considered before and at the time when the act was passed.

The answer of the defendant in this case denies that any tax was collected from the manufacturers of molasses from sorghum after the passage of the act of March 3d, 1865; and, as we have no proof on this point to the contrary, I am of the opinion that the tax collected by John F. Clements, as the Deputy Collector of the defendant, from the manufacterers of molasses from sorghum was collected under the authority of law, and that the amount shown by the books of the defendant to be due from Clements on the 10th day of August, 1865, ovght not to be lessened or diminished for or on account of any money collected by Clements, as Deputy Collector, from the manufacturers of molasses produced from sorghum.

I am also of the opinion that the said amount shown to be due on the said 10th day of August, 1865, ought not to be lessened or diminished on account of any money which may have been due from said Clements while he was the Deputy Collector of Division No. 9, and before the execution of the bond in the penal sum of $10,000, which is admitted by the answer to have been executed and delivered to the defendant between the 1st and 20th days of October, 1863; because it is clearly manifest, as I think, from the answer of the defendant, and from the testimony of Clements himself, a witness of the complainant, that all the money which was due from Clements, as Deputy Collector of Division No. 9, and before the 1st day of October, 1863, was subsequently paid by him to the defendant, out of taxes collected properly applicable thereto, and that no part or share of the balance shown to be due from Clements as Deputy Collector on the said 10th day of August, 1865, had any connection with or relation to any money that may have been due from said Clements, as Deputy Collector of Division No. 9, and prior to October 1st, 1863.

We are now brought to the consideration of the agreement entered on the back of the bond in the penal sum of $10,000, in which the complainant is one of the sureties, and the effect of such agreement; and in the consideration of this question the principles of law as to the appropriation of payments will necessarily be involved. The agreement is in the following words, viz: "August 10th, 1865. We agree that the true amount due on this " bond is the sum of seven thousand six hundred and " eighty dollars and thirty-eight cents, with interest from June 30th, 1865. Witness our hands and seals."

This agreement was signed and sealed by John F. Clements, the principal in said bond, and by each of the sureties therein named, in the presence of N. B. Smithers, Esq: the subscribing witness thereto, and the formal execution

46

thereof is admitted. What are the circumstances that surrounded and attended the signing and sealing of the agreement?

It appears that upon the suggestion of the defendant, made to Daniel L. McBride, one of the sureties in the bond in the penal sum of five thousand dollars, on the ninth day of August, 1865, John F. Clements and all his sureties in each of the bonds on the 10th day of August, 1865, met in the office of the defendant, in Dover, about one o'clock in the afternoon of that day. The accounts of the defendant with said Clements, as Deputy Collector, which had been balanced, as of June 30th, 1865, were shown to Clements, and assented to by him as correct. The balance then shown to be due from Clements, as Deputy Collector, was the sum of eleven thousand five hundred and twenty dollars and fifty-seven cents, with interest from June 30th, 1865. Clements, being asked by one of the sureties what he proposed to do, replied that he was broken and could not pay ; and he then offered to the defendant a bill of sale, signed by himself and partner, for three-fourths of a certain vessel, being their interest therein, for the consideration of $1,800. He also proposed to assign to the defendant certain other partnership effects. A discussion arose between the defendant and the sureties relative to these proposed transfers. Mr. Smithers was sent for, who came and expressed doubts as to the validity of the assignment of the partnership property as against the creditors of the firm of John F. Clements & Co. The sureties urged the defendant to enter the bonds against John F. Clements and issue execution, so as to secure for their benefit all that might be realized from the individual property of Clements before his other creditors had learned of his failure. The defendant remarked that as the amount then due from Clements, as Deputy Collector, was larger than the penalty of either of the bonds it was necessary that they should agree among themselves what

amount should be collected on each of the bonds; and if they did not among themselves agree to the amount to be collected on each bond he would enter the bonds severally against the sureties and rest; and that he felt perfectly satisfied with the bonds which he had. The sureties objected to the entry of the bonds against themselves, as by such a proceeding the failure of Clements would be made known, and other creditors would seize upon the property of Clements; and injury to them, without any advantage, must be the necessary result of such a proceeding on the part of the defendant. A controversy then arose between the sureties on the respective bonds as to their liability thereon—the sureties in the bond in the penal sum of $10,000 contending that they were released from all liability thereon by the defendant having taken the subsequent bond in the penal sum of $5,000; while the sureties in the latter bond contended that their bond was additional only, and their liability therein did not begin until the whole penalty in the other bond had been applied to the indebtedness of Clements. Mr. Smithers was applied to, but declined to express an opinion on these questions, as he was counsel for the defendant. One of the sureties then went for other counsel, and soon returned with Eli Saulsbury Esq. who expressed the opinion that the taking by the defendant of the subsequent bond, in the penal sum of $5,000, did not release the sureties on the bond in the penal sum of $10,000, and Mr. Smithers concurred in this opinion.

Another question then arose, namely, whether the bond in which the complainant was a surety was security for any other taxes collected by Clements than those which were assessed according to the rates prescribed by law existing at the time of the execution of that bond.

It does not appear, from any evidence in this case, that either Mr. Smithers or Mr. Saulsbury was, at that time, consulted professionally relative to this matter; but it

seems, from the testimony of Mr. Green, that this point was suggested by Mr. Saulsbury. After further discussion and controversy between the sureties, (the defendant all the time expressing his determination not to execute the bonds against John F. Clements unless the sureties would, as between themselves, agree to the amount to be collected on each of the bonds,) it was agreed that the amount to be collected on each bond should be in proportion to the penalty thereof, and that all questions between the sureties themselves on the respective bonds, as to their liability thereon, and the amount which, as between themselves, they should respectively contribute, should be referred to Messrs. N. B. Smithers and Eli Saulsbury for amicable adjustment, with power in them, in case of disagreement, to call in a third person. In accordance with this understanding, the entry was indorsed on the bonds, and signed and sealed by the respective obligors therein, and the agreement to refer to arbitration was drawn by Mr. Smithers, executed by all the sureties, and handed to Mr. Saulsbury for safe keeping. After this, the parties, who had been together from six to eight hours, left the office of the defendant.

Such being the circumstances immediately connected with the execution of the agreement indorsed on the bonds and of the agreement to refer all matters of difference between the sureties themselves to arbitration, let us consider whether there was any consideration for the agreement indorsed on the bond in the penal sum of $10,000, or, in other words, whether there was anything due from John F. Clements, as Deputy Collector of Division No. 4, under the bond in the penal sum of $10,000. It was contended by the solicitor for the complainant that the bond in the penal sum of $10,000, in which the complainant was a surety, and which was executed sometime in the month of October, 1863, was security for the faithful execution by Clements of the duties of his office of Deputy Collector, and for the payment by him of all taxes by him collected,

which were assessed according to the rates prescribed by law in force and operative at the time the bond was executed, and that the complainant and his co-sureties cannot be held liable, under the bond, for any taxes which might have been collected by Clements, and which were assessed at rates prescribed by laws enacted since the execution of that bond.

The solicitor for the defendant admitted, for the sake of this case, such to be the law.

In considering the case, therefore, I shall do so on the hypothesis that the principle of law, as above stated by the solicitor for the complainant and assented to in this case by the solicitor for the defendant, is correct, and I shall assume such to be the settled law. It was further contended in the argument for the complainant, that as the bond in which the complainant was a surety was only liable for the taxes which were assessed at the rates prescribed by the act of Congress, approved July 1st, 1862, and not for any taxes which were assessed at rates prescribed by any law passed since October, 1863, and as Clements had made several payments to the defendant which neither he nor the defendant had appropriated, the law would apply these several payments of Clements in discharge of the lists of taxes which were first delivered to him for collection, after his appointment as Deputy Collector of Division No. 4; and as all the payments made by Clements since October, 1863, are equal, if not in excess of the amount of the lists of the taxes assessed at the rates prescribed by the act of Congress, approved July 1st, 1862, nothing remained due from Clements on the bond in which the complainant was a surety, and consequently there was no basis or consideration for the agreement indorsed on this bond.

The general rule of law as to the appropriation of payments is, that the debtor has the right, if he pleases, to make the appropriation; if he omits it the creditor may make it; if both omit, the law will apply the payments

according to its own notions of justice; and, in cases of long and running accounts, where debts and credits are perpetually occurring, and no balances are otherwise adjusted than for the mere purpose of making rests, payments ought to be applied to extinguish the debts according to the priority of time, so that the credits are to be deemed payments *pro tanto* of the debts antecedently due. *United States, vs. Kirkpatrick and others,* 9th *Wheaton,* 720.

This general rule, however, like most general rules, is subject to exceptions. In my opinion the present case is an exception to the general rule; and the rule above quoted is not, I think, applicable to the case before us. In the case of *Stone vs. Seymour and Bourk,* 15th *Wendall,* 19, decided by the Court of Errors of the State of New York, the doctrine as to the appropriation of payments was very much considered and discussed by the Court; and it was held in that case, that where payments were made by a Collector of tolls, after a new bond, with new sureties, was given by him, and there were no directions to appropriate, or circumstances from which an intention on the part of the Collector to appropriate such payments to any particular items of indebtedness could be inferred, and the moneys, when received by the accounting officer, were placed generally to the credit of the Collector, on the general account kept with him, the sureties in the first bond were not entitled to credit for the payments made subsequent to the execution of the second bond—the new sureties being entitled to the benefit of such payments to countervail the claims existing against the Collector for moneys received by him as tolls after the accruing of their liability. In the case of *The United States vs. January and Patterson,* 7th *Cranch,* 572, it was held that where the receiver is a public officer, not interested in the event of the suit, and who receives on account of the United States; where the payments are discriminately made; and where different sureties, under distinct obligations, are interest-

ed, it will be generally admitted that moneys arising due and collected subsequently to the execution of the second bond cannot be applied to the discharge of the first bond without manifest injury to the sureties in the second bond, and, *vice versa.* Justice between the different sureties can only be done by reference to the Collector's books.

In that case the Supervisor had kept one account only against the Collector, and the Supervisor had promised the sureties in the first bond to apply the payments made by the Collector to the first bond, and if all the payments made by the Collector had been so applied, the first bond would have been discharged; yet the Court held that such promise of the Supervisor did not bind the United States, and the Court would not apply the payments made after the execution of the second bond to the first in discharge thereof.

In the case of *The United States vs. Eckford's executors,* 1st *Howard,* 250; and in the case of *Jones vs. The United States,* 7th *Howard,* 681, the rule laid down by the Court in the case of *The United States vs. January and Patterson* was commented on and reaffirmed; and in the case of *Jones vs. The United States,* above cited, the Supreme Court of the United States used this language: "In instances of official "bonds, executed by the principal, at different times, with "separate and distinct sets of sureties, this Court has settled "the law to be that the responsibility of the separate sets "of sureties must have reference to, and be limited by, the "periods for which they respectively undertake, by their "own contract, and that neither the misfeasance nor non- "feasance of the principal, nor any cause of responsibility "occuring within the period for which one set of sureties "have undertaken, can be transferred to the period for "which alone another set have made themselves answer- "able." Upon sound policy and justice to the different sureties in the two bonds given by Clements to the defendant

in this case, and from adjudicated decisions, I think that in the absence of any application of payments by the parties themselves the law would appropriate the payments from collections of taxes assessed under the provisions of law in force at the time of the execution of the bond in which the complainant was a surety, to *that* bond; and to the bond in which Daniel L. McBride is a surety would apply the payments made from collections of taxes imposed by the provisions of law in force at the date thereof, to wit: October 13th, 1864. And, in the absence of any appropriation by the parties, it would be the duty of this Court to examine into the accounts of the defendant with said Clements, and from the best lights which all the evidence in the case afforded, to apportion the amount of the defalcation of Clements between the two sets of sureties according to the principle announced above. From this duty, however, the Court is relieved in the present case, if the agreements indorsed on the bonds are to remain in force and not be disturbed by this Court.

For, in the view which I take of this matter, the entry indorsed on the bonds is an appropriation of the payments which had been made by Clements, as Deputy Collector, towards each of the bonds, and a division between the two sets of sureties of the amount of the defalcation of Clements, and an ascertainment of the amount for which each set of sureties was liable, so far as the defendant himself was concerned; but as between themselves the proportion which each set was to contribute, with other questions of difference among themselves, was, by an agreement of the sureties entered into at the same time with the indorsements on the bonds, referred to the amicable decision of arbitrators chosen by themselves.

Will this Court now disturb the agreement of the parties entered into on the 10th day of August, 1865, and reapply the payments which have been made by Clements?

An examination into the accounts of the defendant with Clements, as Deputy Collector, and of the several payments made by Clements, will—applying the doctrine now held relative to the appropriation of payments, where there are two or more official bonds with different sets of sureties—show that a breach of the condition of both bonds has been committed, and justice demands that each bond should bear its proportion of the loss. We thus see that there is a basis or consideration for the agreement indorsed on the bonds. Was the agreement indorsed on the bonds illegal in itself? Was it procured by or through the fraud of the defendant?—or was there any ignorance or mistake of facts on the part of the complainant and his co-sureties, which it was necessary or material for them to have known or understood at the time of the indorsement on the bonds? An affirmative answer to either of these questions would call for the interposition of a court of equity in behalf of the party aggrieved. It was not pretended, in the argument, that the indorsement on the bonds contravened any principle of law, or that it was in itself illegal; nor was it contended that there was any *actual* fraud on the part of the defendant; but it was contended that there was, on the part of the defendant, constructive fraud, by his not communicating to the sureties certain facts which were in his possession and unknown to them.

We have already stated briefly the most prominent facts immediately connected with the execution of the agreements on the bonds, as they appear from the evidence in the case. The answer positively denies that there was any fraud, actual or constructive, on the part of the defendant, or that he withheld or misstated any facts within his knowledge, which it was material or essential for the sureties to know or understand before the signing by them of the indorsements on the bonds. What was the cause or inducement which led to the signing of the indorsements?

47

The sureties were all anxious that the defendant should enter the bonds against Clements and issue execution immediately, and thus secure all that could be saved to them from the individual property of Clements before his other creditors had learned his pecuniary condition; and they were urgent in their endeavors to get him to do so. The defendant would not consent to this unless the sureties would agree among themselves what proportion of the amount of the defalcation should be collected on each bond; and at the same time he told the sureties that, unless they would agree among themselves to the amount to be collected on each bond, he would enter the bonds severally against all the sureties and there rest. Was there anything improper in this? If the doctrine above laid down as to the appropriation of payments on official bonds, where there are different sets of sureties, be correct, it would have been necessary for the defendant, in case the sureties had not agreed to the amount to be collected on each bond, before he could have issued execution on the judgments obtained on the bonds, to have gone carefully over all the accounts of Clements, as Deputy Collector, from the first of October, 1863, until he was removed, embracing a period of about one year and eight months, and to have apportioned the payments to the bonds according to the principle above stated.

This would necessarily have required some time. The sureties were very anxious to avoid all delay, lest other creditors might seize upon Clements' property in advance of them. It is evident, as I think, that the cause or inducement that influenced the sureties to sign the indorsements on the bonds was, that by so doing the defendant would issue execution against Clements and thus save them whatever amount would be realized from his individual property before his other creditors could have execution against him. It was for the benefit of the sureties alone, and no advantage could have accrued to the defendant

therefrom, unless it be from the time and trouble which he must otherwise have taken to have ascertained the true amount due on each bond.

It was contended, in the argument, that there were facts connected with this case of which the sureties, at the time of the conference in the office of the defendant, August 10th, 1865, were ignorant, and which, had they known, they would not have signed the indorsement on the bonds. But what facts are there, material or essential for them to have known, and which they then did not know or understand ? According to the view which I take of this case, the defendant never consented to the use of the public money by Clements, or the firm of John F. Clements & Co., or by any other person ; no payments had been made by Clements, as Deputy Collector, which had not been properly credited to his account by the defendant; no payment from collections of taxes, assessed since the execution of the bond in the penal sum of $10,000, had been applied by the defendant in discharge of Clements' liability under the first bond in the penal sum of $15,000, and the tax which had been collected by Clements from the manufacturers of molasses from sorghum was, in my opinion, collected under proper authority of law. It is asserted, however, that the defendant concealed from the complainant the true state of the accounts of Clements, as Deputy Collector, and that such concealment amounts to constructive fraud on the part of the defendant.

The only evidence we have of any application by the complainant to the defendant for information as to the accounts of Clements, is the conversation which is stated in the answer to have occurred in the early part of June, 1865, on the street, in Dover, as the defendant was going to the Farmers Bank. In that conversation I can discover no misstatement or concealment on the part of the defendant.

It is true, the defendant did not inform the complainant

of the amount Clements was then in arrears; but he was not interrogated as to the amount, nor did the complainant go to the office of the defendant on that occasion, or make any request to see the accounts of Clements. The defendant responded directly to the questions propounded to him by the complainant, and, as far as there is any evidence to show, truthfully. It was maintained in the argument that the sureties, at the time of the signing of the indorsement on the bonds, did not know that the liability under the bonds extended only to the taxes assessed at rates prescribed by the law in force at the time the bonds were respectively executed. This, at best, is a question of law, and not of fact. But the evidence clearly proves that this very matter was discussed by the sureties at the time of the signing of the indorsements, and is one of the questions which, in the agreement entered into by the sureties themselves, is specially referred to Messrs. Eli Saulsbury and Nathaniel B. Smithers for amicable arbitrament.

It is further contended for the complainant that the sureties, on the 10th day of August, 1865, were ignorant that the defendant had not been reappointed to his office, and had not given new bond since the passage of the act of Congress, approved June 30th, 1864, and that Clements had not been reappointed Deputy Collector since the approval of said act.

These questions will be considered hereafter, and all I propose to say at this time relative to these points is that, assuming the law to be settled that the bond in which the complainant is a surety is only liable for the taxes imposed by law as the law existed at the time of the execution of that bond, it was not, in my opinion, essential or material for the complainant or his co-sureties to have known these facts at the time they executed the agreement indorsed on their bond. In 1st Story's Equity Jur. Section 157, the author, commenting on the evidence on which a court of

equity will relieve against contracts, says : " Relief will be granted in the case of written instruments only where there is a plain mistake, clearly made out by satisfactory proof,"—" and it forbids relief wherever the evidence is loose, equivocal or contradictory, or is in its texture open to doubt or opposing presumptions."

Is there, in this case, a plain mistake of facts (for it is admitted in the argument that a mistake in law alone will not be sufficient ground to afford relief, and such is the well settled law) on the part of the complainant and his co-sureties clearly made out by proof satisfactory to the Court ? I think not.

The parties were together, at the office of the defendant, on the 10th day of August, 1865, from five to seven hours. The books and accounts of the defendant with Clements, as Deputy Collector, were open to the inspection and examination of all concerned ; the defendant was present, ready to make any exhibition and explanation of the accounts that might have been required of him. Discussions arose between the sureties as to the extent and amount of their liability under their respective bonds. Eminent counsel were sent for and came, and could have furnished any legal information which the parties might have desired in reference to the matter then before them. These counsel remained until the close of the conference. Clements was present; and, if the answer is to be credited, examined the accounts and assented to them as correct.

No concealment or misrepresentation of any fact was made by the defendant on that occasion, if the evidence before us is to be believed. Will the Court, maturely considering all the facts and circumstances which have been proved in this case, interfere with this agreement, executed on the back of the bond with so much solemnity and after such serious consideration ? I think not. Nor, according to the view which I take of this case, will the different sets of sureties in the bond be aggrieved by the

apportionment which they made on the respective bonds. A careful examination of the accounts of the defendant with John F. Clements, as Deputy Collector, and of the several payments made by said Deputy Collector, at the same time keeping in remembrance the acts of Congress under which the taxes were assessed, so as not to be misled by the dates at which the lists were delivered to Clements, will, I think—applying the different payments according to the rule laid down above, where there are official bonds, with different sets of sureties—show that the apportionment by them of their liability under each bond is not very far different from what this Court would have made in the absence of any agreement between the parties. At the same time that the indorsement on the bonds was signed, an agreement between the sureties themselves was executed for the purpose of correcting among themselves any wrong or injury which might be done to either set of sureties by the execution of the entry on the back of the bonds ; and the same eminent counsel who were present at the conference at the office of the defendant were selected by the sureties to decide, as between the sureties themselves, what proportion of the amount of Clements' defalcation should be borne by each set of sureties, as well as all other questions of difference between them.

If, therefore, the amount indorsed on the bond in which the complainant is a surety is larger than it ought to be, the complainant and his co-sureties can call upon the sureties in the bond in which McBride is a surety for contribution ; and *vice versa* if the amount indorsed on the bond in which McBride is a surety is more than it ought to be, he and his co-sureties can call upon the complainant and his co-sureties for contribution.

This agreement between the sureties themselves was not only proper but eminently wise and judicious under the circumstances.

In the anxiety and haste of the sureties to have an exe-

cution issued against Clements before any of his other creditors had learned of his pecuniary embarrassment, there was neither time nor opportunity to have examined carefully into all the accounts and payments of Clements, and to have ascertained the exact and true amount due on each bond. Therefore, to guard against any act which, as among themselves, might work wrong or injury to the one or the other set of sureties, they entered between themselves into the agreement, stated in the answer, referring their matters of difference to Eli Saulsbury, and N. B. Smithers, Esquires.

The indorsement on the bonds and the agreement to refer to arbitration were one and the same transaction concurrent with and dependent on each other. For it is clearly proved, that if the agreement to refer to arbitration had not been signed by the complainant and his co-sureties, the indorsement on the bond in $5000 would not have been executed by McBride. If the Court is to disturb the indorsements on the bonds, it must also interfere with the agreement of reference ; for, as before stated, they form parts of one entire transaction. Such an interposition by the Court would destroy the arrangement made by the different sets of sureties amicably to settle all matters of difference between them arising out of their suretyship. After a careful consideration of the agreement on the bonds and the agreement to refer to arbitration, and of all the facts and circumstances connected therewith, I am of the opinion that this Court ought not to disturb or interfere with either the agreement indorsed on the bonds or the agreement of the sureties to leave their matters of difference to reference for amicable adjustment.

It was contended, however, that the defendant in this case ought to have discharged Clements from his office as Deputy Collector as soon as he learned of the use by Clements of the public money, which, by the answer, is

admitted to be about the first of February, 1865. Let us now consider this point. What was the contract of the complainant and his co-sureties ? For this we must look to the bond itself. It is not necessary here to set forth the bond in full, but the condition, in substance, is that said Clements shall faithfully collect all rates and taxes which he shall be required to collect, or which may be committed to him for collection, and shall pay over all such taxes at such times and in such manner as said Day shall direct; and further, that he shall in all respects perform the duties of his office of Deputy Collector with fidelity. It will be seen from the condition of the bond that there were three matters for which the complainant and his co-sureties contracted ;—1st, that Clements should collect the taxes; 2nd, that he should pay over all such taxes; and 3rd, that he should perform with fidelity all the duties of his office of Deputy Collector. The use of the public money by Clements and his neglect to pay it over when required to do so by the defendant was clearly a breach of the condition of the bond, and against such a breach the complainant and his co-sureties had expressly contracted.

Shall it now be said that, because an act has been committed which the complainant and his co-sureties had given bond should not be done, he and they should be discharged from all liability after the act committed ? It was a breach of the condition of the bond that Clements did not pay over the taxes whenever he was required to do so by the defendant; yet it appears by the answer that it frequently happened that Clements did not pay over when he was required to do so.

Would it be pretended that because Clements did not pay at the very first time he was required to pay he should have been discharged from his office by the defendant, and that the sureties are not to be held liable for subsequent misconduct of Clements? If not in the one case, how can it be in the other? The use of the public money by Clem-

ents in his business was a breach of the condition of his bond, and so was his neglect to pay over his collections when required by the defendant. It is a well settled principle of law that whenever a creditor, without the knowledge and consent of the surety, makes a valid contract with his principal debtor, thereby extending the time for payment, the surety is discharged. And why? Because the surety may well say, "*non in hæc fœdera veni.*" It is also well settled that the mere consent to the delay of payment because the principal debtor had not the ability to pay presently, and without any new consideration, does not discharge the surety (*Sailly vs. Elmore,* 2 *Paige Chancery Reports,* 500; *McLemore vs. Powell and others,* 12 *Wheaton,* 554). If the defendant in this case, when he learned of the use of the public money by Clements had consented or agreed to such improper use, the argument of the solicitor for the complainant on this point might have had force, and it might well have been a question whether the sureties were not discharged. But the evidence is that when the defendant was apprised of the improper use of the money he reproved Clements for such official misconduct, and did so more than once. Besides, there is no proof that the public money was used by Clements in his business, or the business of John F. Clements & Co., after the first of February, 1865. In fact, the presumption is that the public money was not used by Clements after that time; for on the first day of February, 1865, the amount of the indebtedness of Clements, as Deputy Collector, was nearly two thousand dollars larger than the amount he admitted to be due on the 10th day of August, 1865. In the case of *The United States vs. Kirkpatrick and others,* 9 *Wheaton* 720, it was held that where the law requires quarterly or other perodical accounts and settlements, a mere omission to bring suit upon the neglect of the officer or agent to account will not discharge his sureties; and the Court in commenting upon this branch of the case then before

48

them, among other things, say : " It is admitted that mere laches, unaccompanied with fraud, forms no discharge of a contract of this nature, between private individuals." Such is the clear result of the authorities. In the case of *The United States vs. Vanzandt,* 11 *Wheaton,* 184, it was held that the omission of the proper officer to recall a delinquent paymaster under the injunction of the 4th section of the act of 24th of April, 1816, does not discharge his surety. The provisions of said act required that a paymaster who failed to render his vouchers to the paymaster-general for settlement of his accounts for more than six months after he had received funds should be recalled, and another appointed in his place. In that case the paymaster had failed to render his accounts to the paymaster-general for settlement within the time required, and he had not been recalled, and additional funds had been subsequently placed in his hands; yet it was decided by the Court that his surety was not discharged from any liability which had occurred after his failure to render his vouchers for settlement. If the decision of the Supreme Court of the United States in the case just above cited be correct, and its soundness, so far as I know, has never been questioned, how can the complainant and his co-sureties complain because the defendant did not remove Clements from office as soon as he had learned of the improper use of the money ?

There is no provision of law requiring that a Deputy Collector should be removed under such circumstances; nor was it any part of the contract of the complainant and his co-sureties with the defendant. I can discover no wrong or injury done or committed to the complainant and his co-sureties in this case by the continuance of Clements, as Deputy Collector, after the defendant had learned of the use by him of the public money. On the contrary, it seems that the complainant and his co-sureties were benefited by his being continued in office ; for, as before stated, the indebtedness of Clements, as Deputy Collector, to the de-

fendant, was nearly two thousand dollars in excess of the amount agreed to be due from him on the 10th day of August, 1865. Besides, it appears by the answer that Clements was actually removed from office on the 15th day of July, 1865, and that no lists of taxes had been committed to him for collection after June 30th, 1865.

I am of the opinion that the continuance of Clements as Deputy Collector and the delivery to him of new lists of taxes for collection, after the defendant had been apprised of the improper use by Clements of the public money, are not sufficient grounds for the discharge of the complainant and his co-sureties from any of the liability under the aforesaid bond.

I now propose to consider the necessity of the defendant in this case giving new bond after the passage of the act of Congress of June 30th, 1864. I will first premise, however, by stating that, according to the view which I take of this case, and as hereinbefore expressed, I do not think it incumbent on the Court to express an opinion on the question before us in the present case. But as this point was pressed with great force, and argued with much ability by one of the solicitors for the complainant, and as it is a vital point in the case of McBride *vs.* this defendant, in which case I do not propose to give a written opinion, I feel it my duty here to express, in writing, my views in relation thereto. It was contended by the solicitor for the complainant, that Section 173 of the act of Congress of June 30th, 1864, repealed the act of July 1st, 1862, entitled, " An Act to provide internal revenue to support the " Goverment and pay interest on the public debt," under which the defendant was appointed Collector of Internal Revenue for the District of Delaware, except certain portions thereof, which are expressly saved by the repealing section ; that the effect of such repeal, except as to the savings, is a complete deletion or wiping out of the act

repealed, as fully to all intents and purposes as if said act had never existed. Of the truth and force of this argument there cannot, I think, be any doubt. But let us see what are the savings in the act of July 1st, 1862, which are excepted from the consequences of the repeal thereof. It is not necessary to enumerate all of them, but only such as bear upon the case before us. We find in Section 173 of the act of June 30th, 1864, among other exceptions, the following : "and, excepting further, all provisions of said act which "create the offices of Commisioner of Internal Revenue, "Assessor, Assistant Assessor, Collector, Deputy Collec- "tor, and Inspector, and provide for the appointment and "qualification of said officers. The same section after- ward continues as follows : "*Provided* that all the pro- "visions of said acts shall be in force for levying and col- "lecting all taxes, duties and licenses, properly assessed "or liable to be assessed, or accruing under the provisions "of former acts, or drawbacks the right to which has al- "ready accrued or which may hereafter accrue under said "acts, and for maintaining and continuing liens, fines, "penalties, and forfeitures incurred under and by virtue "thereof," and for " carrying out and completing all pro- "ceedings which have been already commenced, or that "may be commenced, to enforce such fines, penalties, and "forfeitures, all criminal proceedings under said acts, and "for the punishment of crimes of which any party has been "or shall be found guilty. *And provided further*, That no "office created by the said acts and continued by this act "shall be vacated by reason of any provisions herein con- "tained ; but the officers heretofore appointed shall con- "tinue to hold the said offices without re-appointment." It will be seen, as I think, clearly by the language above quoted from the repealing section of the act of June 30th, 1864, that the office of Collector of Internal Revenue was continued, and the Collector himself continued in office, and saved from the effect of the repeal of the act July 1st, 1862.

Indeed, it was admitted in the argument of the solicitor for the complainant, that the defendant in this case was continued in office by the savings aforesaid, and that his re-appointment by the President of the United States after June 30th, 1864 was not necessary. But it was contended that before he could perform any of the duties of his office, or legally continue therein, it was necessary for him to give a new bond, and the argument was founded on the words used in Section 9 of the Act of June 30th, 1864. What does Section 9 say ?  " *Be it further enacted*, that before any collector shall enter upon the duties of his office " he shall execute a bond for such amount as shall be pre- " scribed by the Commissioner of Internal Revenue, un- " der the direction of the Secretary of the Treasury, with " not less than five sureties, to be approved by the Solicitor " of the Treasury, conditioned that said collector shall " faithfully perform the duties of his office according to law, " and shall justly and faithfully account for and pay over " to the United States, in compliance with the order or " regulation of the Secretary of the Treasury, all public " monies which may come into his hands or possession ; " which bond shall be filed in the office of the First Comp- " troller of the Treasury. And such collector shall, from " this time, renew, stregthen and increase his official bond " as the Secretary of the Treasury may direct, with such " further conditions as the said commissioner shall pre- scribe."

Was it the intention of Congress, to be gathered from the words last above quoted, to require that every collector who had been continued in office by the saving clauses of Section 173 should give a new bond before he could lawfully perform any of the duties which devolved upon him under the provisions of the Act of June 30th, 1864? The words are that " before any collector shall enter upon the duties of his office, he shall," &c. The words " any collector" certainly are broad, and taken by themselves would

include collectors continued in office as well as those who were newly appointed; but the other words, " before he enters upon the duties of his office," to my mind have a restraining effect, and limit the words " any collector" to those newly commissioned.   How can it be said that a collector who is continued in office and already in enters upon the duties of his office ?   The defendant in this case entered upon the duties of his office in 1862, and has continued in the discharge thereof up to the present time by virtue of the savings in Section 173 of the Act of June 30, 1864.

The whole argument of the solicitor for the complainant, who pressed this point with so much earnestness upon the Court, was based on the assumption that by the repeal of the act of July 1st, 1862, the defendant was out of his office of Collector, and had to commence anew; and the illustrations referred to by him under the statutes of our own State were cases in which a failure to give bond within the time prescribed were by the terms of the law itself *ipso facto* a forfeiture of office.   In the present case, as we have before seen, the office and officer were both continued by the savings aforesaid.   In the case of the *Bank of the United States vs. Dandridge*, 12 *Wheaton*, 64, it was held that where a cashier was duly appointed and permitted to act in his office for a long time under the sanction of the directors, it was not necessary that his official bond should be accepted by the Board of Directors as satisfactory according to the terms of the charter in order to enable him to enter legally upon the duties of his office. In that case one of the fundamental articles of the charter required that each cashier or treasurer, before he enter on the duties of his office, should give bond, with two or more sureties, to the satisfaction of the directors, in a sum not less than $50,000, with a condition for his good behavior and the faithful performance of his duties to the corporation. The Supreme Court of the United States say that the

charter and by-laws of the bank must be considered as directory to the Board of Directors, and not as conditions precedent, and that the cashier could legally discharge the duties of his office without first giving bond, as directed by the fundamental article.

It will be seen that the words in the fundamental article of the bank charter are very similar, and certainly as strong as the language in Section 9 of the act of June 30th, 1864. In the case of *The United States vs. Vanzandt*, heretofore cited on another point, the language of the act of Congress requiring the recall of a paymaster who failed to render his accounts for settlement to the paymaster general within the time prescribed by said act was equally as strong, if not stronger, than the language of said Section 9. Yet the same Court say, that this provision is merely directory to the officer, and intended for the security and protection of the goverment by insuring punctuality and responsibility ; but they form no part of the contract with the surety. In the case of *The United States vs. Kirkpatrick*, above cited from 9 *Wheaton*, 720, the same principle is announced by the Court.

I can discern no difference,in principle, between the cases last above cited and the point now under consideration in this case ; and from principle and adjudicated decisions of the Supreme Court of the United States and of other States, I think that the provision of Section 9 of the act of Congress of June 30, 1864, are directory only, and not conditions precedent, and.that such provisions were inserted in the said act for the benefit and protection of the Government. A contrary doctrine would place in the hands of the Secretary of the Treasury the power to clog the wheels of the Government and to destroy the whole machinery for the collection of the necessary funds to support the Government and pay the interest on the public debt.

And, although the consequences which might result should never influence a court to decide a case contrary

to the well established principles of law, yet it will scarcely be pretended that the Congress of the United States intended to place such unlimited powers in the hands of the Secretary of the Treasury, or any other of its officers. At the time of the passage of the Act of June 30th, 1864, there were a large number, some two or three hundred collectors of internal revenue in the country, who were continued in office by the said act; and, if the doctrine of the solicitor for the complainant is correct, none of these officers had any legal authority to collect any tax imposed by said act until they gave new bonds.  The amount for which the bond is to be given must be prescribed by the Commissioner of Internal Revenue under the direction of the Secretary of the Treasury.  Suppose the Secretary of the Treasury failed or neglected to give any instructions ?  We have some three hundred collectors in office, but without the authority to collect one cent of the taxes intended for the support of the Government.

I do not think that Congress ever intended to place it in the power of any officer to throw the whole country into such a dilemma ; nor do I think that the words of the act itself will sustain the construction given by the complainant's solicitor.

It is to be presumed that the Secretary of the Treasury is acquainted with the duties of his office and with the laws relating thereto ; and that if he considered it necessary for the defendant in this case to have given new bond after June 30th, 1864, he would have required one of him.

We know not what the condition of the official bond of the defendant may be; but it was competent for him and his sureties to have contracted for the faithful discharge of the duties of his office under the law as it then existed, and under all future laws that might be enacted by Congress.  Such may be the condition of his official bond, and the Secretary of the Treasury may deem it sufficient. But, to lay aside all surmises and presumptions, I am of

the opinion that, according to the settled principles of law, as I understand them, it was not necessary for the defendant in this case to have given a new bond after the passage of the act of June 30th, 1864, to enable him lawfully to continue in the discharge of the duties of the office of Collector of Internal Revenue for the District of Delaware, and that the sureties of the said John F. Clements on his two aforesaid official bonds as Deputy Collector are not discharged from any liability by reason of the said defendant not giving new bond after the passage of said act of June 30th, 1864.

I have now considered all the questions raised by the bill, answer, and proofs, which were necessary and material to be considered by the Court for a correct decision of this case.

There were other grave points pressed upon the Court by the counsel, upon which I have not deemed it necessary to express an opinion, as I did not consider them material for me to decide upon, according to the view which I have taken of the case.

I have also expressed, as briefly as I could under the circumstances, and I know very imperfectly, some of the principal reasons which have influenced my mind in the conclusions at which I have arrived.

The case was ably argued at the bar, and pressed with much force and earnestness by the solicitors for both parties; and the learning exhibited in the arguments has materially assisted me in my consideration of the subject.

I have felt less embarrassment in deciding the case than I should otherwise have experienced if from my decision there were no appeal; but if the complainant and his co-sureties feel themselves aggrieved by the conclusions to which I have arrived, they can seek their redress in another tribunal, where the decisions of this Court may be reviewed, and where the experience, learning and ability of the

judges who there preside will correct any errors into which I may have fallen.

Let the injunction be dissolved, and a decree entered accordingly.